| People v Trump |
|:---:|
| 2024 NY Slip Op 34410(U) |
| December 16, 2024 |
| Supreme Court, New York County |
| Docket Number: Indictment No. 71543-23 |
| Judge: Juan M. Merchan |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

---

THE PEOPLE OF THE STATE OF NEW YORK

- against –

DONALD J. TRUMP,

Defendant.

**DECISION and ORDER**

Defendant's Motion to
Dismiss the Indictment and
Vacate the Jury's Verdict
Pursuant to C.P.L.
§ 330.30(1)

Indictment No. 71543-23

---

JUAN M. MERCHAN, A.J.S.C.:

### PART I: BACKGROUND AND PROCEDURAL HISTORY

Trial commenced on the instant matter on April 15, 2024, and continued through May 29, 2024, when the jury received the case to begin deliberations. The following day, on May 30, 2024, the jury returned a verdict of guilty on 34 counts of Falsifying Business Records in the First Degree. That same day, this Court set a deadline of June 13, 2024, for the filing of post-trial motions and adjourned to July 11, 2024, for the imposition of sentence. The June 13, 2024, deadline passed without Defendant filing motions.

On July 1, 2024, the Supreme Court of the United States, rendered a landmark decision in *Trump v. United States*, 603 US 593 [2024]. Defendant filed a pre-motion letter dated that same day seeking leave of this Court to file the instant motion pursuant to Criminal Procedure Law ("CPL") § 330.30(1). Defendant argued in his letter that the jury's verdict must be set aside pursuant to *Trump* because "DANY should not have been permitted to offer evidence at trial of President Trump's official acts." Defendant's Letter dated July 1, 2024.

Defendant first broached the topic of Presidential immunity on December 22, 2022, in a motion for summary judgment he filed in an unrelated case brought against him for defamation. *Carroll v. Trump*, 680 F.Supp.3d 491, 498 [SD NY 2023]. In that motion, Defendant argued that the suit should be dismissed because a "President is 'entitled to absolute immunity from damages liability predicated on his official acts,'" and that the alleged defamatory statements introduced at that trial fell within the outer perimeter of his official duties as President. *Id.* at ECF No. 109 citing *Nixon v. Fitzgerald*, 457 US 731 [1982].

Defendant was arraigned on the instant matter several months later, on April 4, 2023. Approximately one month later, on May 4, 2023, Defendant filed a Notice of Removal in the Southern District of New York. *New York v. Trump*, 683 F.Supp.3d 334 [SD NY 2023]. In the Notice of Removal, he argued that "this case involves important federal questions" because the indictment contains charges related to conduct that Defendant "committed while he was President of the United States that was within 'the color of his office.'" *Id.* at ECF No. 1. The motion was denied by Judge Hellerstein on July 19, 2023, who found that the Defendant "failed to show that the conduct charged by the Indictment is for or relating to any act performed by or for the President under color of the official acts of a President." *Id.* at 351.

On June 13, 2023, Defendant was indicted in the United States District Court for the Southern District of Florida on charges related to his alleged handling of classified documents. *United States of America v. Trump, et al.*, S.D. Fla, 23 CR 80101, (AMC) (hereinafter the "*Florida Documents Matter*"). On August 3, 2023, the Defendant was indicted in Washington, D.C. for allegedly interfering with the 2020 Presidential election. *United States v. Trump*, US Dist Ct, D.D.C 23 CR 257, (TSC) (hereinafter "*January 6th Matter*").

On September 29, 2023, Defendant filed an omnibus motion in the instant matter in which he did not raise any issues with respect to Presidential immunity or the Supremacy Clause. *See* Defendant's Omnibus Motion *generally*. Five days later, on October 5, 2023, Defendant moved to dismiss the *January 6th Matter* on the grounds of Presidential immunity. *January 6 Matter* at ECF No. 74. On February 22, 2024, Defendant moved to dismiss the criminal indictment in the *Florida Documents Matter* on the grounds of Presidential immunity, arguing that the "charges stem directly from official acts by President Trump while in office." *See Florida Documents Matter* at ECF No. 324. That same day, Defendant filed motions *in limine* in the instant matter wherein he sought, among other things, to: preclude the People from arguing that "President Trump sought to improperly influence the 2016 election;" preclude the testimony of Dino Sajudin, Karen McDougal and Stephanie Clifford; preclude the People "from suborning Michael Cohen's perjury;" and preclude the People from "introducing the nearly 100 statements they seek to attribute to President Trump." Defendant's Motions *in limine* at pg. 40. Notably, Defendant did not raise the defense of Presidential immunity even though he had already done so in the Notice of Removal he filed with the Southern District of New York, the *Florida Documents Matter* and the *January 6th Matter*.[1] In fact, Defendant again

---

[1] Counsel in the instant matter also represented Defendant in the *Florida Documents Matter* and the *January 6th Matter*, both of which have been dismissed.

failed to argue Presidential immunity in his Reply to the People's motions *in limine* which he filed a week later, on February 29, 2024.

On March 7, 2024, 18 days before the then scheduled trial date of March 25, 2024, Defendant for the first time in the instant matter moved to preclude various pieces of evidence on the grounds of Presidential immunity. By Decision and Order dated April 3, 2024, this Court denied the motion as untimely pursuant to CPL § 255.20(3), holding that Defendant "had myriad opportunities to raise the claim of Presidential immunity well before March 7, 2024" but failed to do so. *See* this Court's Decision and Order dated 4/3/24 at pgs. 5-6.[2]

As noted above, Defendant filed the instant CPL § 330.30(1) motion after the Supreme Court rendered its July 1, 2024, decision but after this Court's June 13, 2024, deadline for the filing of post-verdict motions. Nonetheless, this Court granted leave, set a briefing schedule and adjourned sentencing in order to carefully analyze the Defendant's arguments in the context of *Trump* and to determine whether that Decision has any bearing on the case at bar.[3]

The following constitutes the Decision and Order of this Court.

### PART II: *TRUMP V. UNITED STATES*, 603 US 593 [2024]

On August 1, 2023, a federal grand jury indicted Donald J. Trump for conduct that allegedly occurred during his Presidency following the 2020 Presidential election. *Trump* at 602. Trump moved to dismiss the indictment on the grounds of Presidential immunity. *Id.* at 603. The Federal District Court for the D.C. Circuit denied the motion. *Id.* at 604. Defendant appealed and the D.C. Circuit Court of Appeals affirmed. *Id.* The Supreme Court of the United States granted *certiorari* "to answer the following question: '[w]hether and if so to what extent does a former President enjoy presidential immunity from criminal prosecution for conduct alleged to involve official acts during his tenure in office.'" *Id.* at 605. The Supreme Court identified *Trump* as "the first criminal prosecution in our Nation's history of a former President for actions taken during his Presidency"[4] and then elaborated on the issue before it: "We are called upon to consider whether and under what circumstances such a prosecution may proceed." *Id.*

---

[2] In a letter motion filed with this Court on April 16, 2024, Defendant again raised the argument of evidence preclusion premised on Presidential immunity. The motion incorporated Defendant's March 7, 2024, Presidential immunity motion.

[3] During the pendency of the instant motion, Defendant filed a separate motion to dismiss pursuant to CPL §§ 210.20(1)(h) and 210.40(1). That motion has not yet been decided.

[4] As noted in the Procedural History, *supra*, the instant matter was arraigned on April 4, 2023, months before Defendant was indicted in the *January 6th Matter*.

3

The Supreme Court concluded that, "the nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office. At least with respect to the President's exercise of his core constitutional powers, this immunity must be absolute." *Id.* at 606. The *Trump* Court identified some of the duties within his core constitutional powers as commanding the Armed Forces, granting reprieves and pardons, appointing public ministers and foreign relations such as "making treaties, appointing ambassadors, recognizing foreign governments, meeting foreign leaders, overseeing international diplomacy and intelligence gathering, [...] terrorism, trade and immigration." *Id.* at 607. As the President's duties within his core constitutional powers are of "unrivaled gravity and breadth," a President must be permitted to make decisions of the utmost import without fear of prosecution. *Id.* Thus, "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority." *Id.* at 609.

The *Trump* Court however, recognized that "not all of the President's official acts fall within his conclusive and preclusive authority." *Id.* The President sometimes acts in a "zone of twilight" and the reasons that justify absolute immunity do not apply to those acts. *Id.* Before analyzing and deciding which acts fall within this "zone of twilight," where the President's authority is shared with Congress, the *Trump* Court "recognize[d] that only a limited number of our prior decisions guide determination of the President's immunity in this context. That is because proceedings directly involving a President have been uncommon in our Nation and 'decisions of the Court in this area' have accordingly 'been rare' and 'episodic.'" *Id.* at 610 citing *Dames & Moore v. Regan*, 453 US 654 661 [1981]. Lacking precedent on point, the *Trump* Court, "[t]o resolve the matter [looked] primarily to the Framers' design of the Presidency within the separation of powers, [its] precedent on Presidential immunity in the civil context, and [...] criminal cases where a President resisted prosecutorial demands for documents." *Id.* Notably absent of course, was any precedent where a President was criminally charged for actions taken while in office – the specific issue the *Trump* Court was tasked with resolving. *Id.* at 639 ("No court has ever been faced with the question of a President's immunity from prosecution. All that our Nation's practice establishes on the subject is silence.")

In its analysis of Presidential immunity in the civil context, the *Trump* Court cited and relied in large part, upon *Fitzgerald*, 457 US 731, which held that a President must be absolutely immune from "damages liability for acts within the 'outer perimeter' of his official duties." *Fitzgerald* at 756. Conversely, when considering the issue of document demands upon the President in the criminal context, the *Trump* Court relied upon *United States v. Nixon*, 418 US 683 [1974], which held that when

4

a subpoena is issued to a president to produce certain evidence, there can be no claim of absolute privilege "given the 'constitutional duty of the Judicial Branch to do justice in criminal prosecutions.'" *Trump* at 612. But the *Trump* Court recognized that "[c]riminally prosecuting a President for official conduct undoubtedly poses a far greater threat of intrusion on the authority and functions of the Executive Branch than simply seeking evidence in his possession, as in *Burr* and *Nixon*." *Id.* at 613. The *Trump* Court was careful to acknowledge that "[t]he President, charged with enforcing federal criminal laws, is not above them." *Id.* at 614. "Taking into account these competing considerations, we conclude that the separation of powers principles explicated in our precedent necessitate at least a *presumptive* immunity from criminal prosecution for a President's acts within the outer perimeter of his official responsibility." *Id.*

The *Trump* Court instructed that the first step in analyzing whether a former President is entitled to immunity is to "distinguish his official from unofficial actions" and the first step in doing that is to assess the "President's authority to take that action." *Id.* at 617. The *Trump* Court recognized however, that "no court has thus far considered how to draw that distinction," and the task "can be difficult." *Id.* "Critical threshold issues in this case are how to differentiate between a President's official and unofficial actions, and how to do so with respect to the indictment's extensive and detailed allegation covering a broad range of conduct. We offer guidance on those issues below." *Id.* The *Trump* Court stopped short of resolving, at least completely, the issue before it and notably refrained from deciding what level of immunity was sufficient for official actions lying within the outer perimeter of a President's authority. "At the current stage of proceedings in this case, however, we need not and do not decide whether that immunity must be absolute, or instead whether a presumptive immunity is sufficient." *Id.* at 606. In doing so, the *Trump* Court observed that "[d]espite the unprecedented nature of this case, and the very significant constitutional questions that it raises, the lower courts have rendered their decisions on a highly expedited basis. Because those courts categorically rejected *any* form of Presidential immunity, they did not analyze the conduct alleged in the indictment to decide which of it should be categorized as official and which unofficial. Neither party has briefed that issue before us." *Id.* at 616. As a result, the *Trump* Court remanded the case to the Federal District Court "to determine in the first instance-with the benefit of briefing we lack-whether Trump's conduct in this area qualifies as official or unofficial." *Id.* at 628.

Notwithstanding the determination to remand as to all other claims, the *Trump* Court did find Trump "absolutely immune from prosecution for *the alleged conduct* involving his discussions with

5

Justice Department officials."[5] *Id.* at 621 (emphasis added). In attempting to assuage the concerns expressed by the dissent, Chief Justice Roberts succinctly clarified the majority's holding. "As for the dissent, they strike a tone of chilling doom that is wholly disproportionate to what the Court actually does today – conclude that immunity extends to official discussions between the President and his Attorney General, and then remand to the lower courts to determine 'in the first instance' whether and to what extent Trump's remaining alleged conduct is entitled to immunity;" the *Trump* Court expressly indicating that its holding is no broader than that. *Id.* at 637.

Because the *Trump* Court remanded to the Federal District Court, for it to conduct its own evaluation, the Court provided some guidance for distinguishing "official" from "unofficial" acts and the context within which that analysis should be performed. As framed by Chief Justice Roberts, there "accordingly 'exists the greatest public interest' in providing the President with 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 611 *citing Fitzgerald* at 752, quoting *Ferri v. Ackerman*, 444 US 193, 203 [1979]. And further, the *Trump* Court emphasized the need to safeguard "the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution." *Id.* at 614. But also, "[t]he President enjoys no immunity for his unofficial acts, and not everything the President does is official. The President is not above the law." *Id.* at 642. Thus, while a finding of official conduct of a President acting within the core constitutional authority imparts absolute immunity, presumptive immunity from prosecution for an official act in the outer perimeter is overcome if "the Government can show that applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch,'" as long as this analysis precludes inquiry into the President's motives. *Id.* at 614, 618.

That the ruling offered some guidance but ultimately remanded to the District Court for a more thorough exploration of the relevant facts, speaks to the narrowness of its holding. *Trump* involves a unique set of facts, applied to a rarely explored area of the law without precedent directly on point in our Nation's history. That holding was guided by the bedrock principle, as first set forth by the Supreme Court in the limited precedent in this area, to wit *Fitzgerald* and *Clinton*, that a sitting

---

[5] The *Trump* Court was able to rule on the applicability of the Presidential immunity doctrine as to charges related to a President's discussions with his Attorney General because it had a sufficient record on that issue. However, the case was remanded for the lower court to develop a similarly robust record for possible review of the other claims on appeal. Remand was necessary in *Trump*, but the Supreme Court did not hold that lower courts *must* conduct such hearings in every instance. Thus, Defendant's claim that the absence of a formal hearing constitutes a mode of proceedings error is unsupported.

6

President must "make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system" without undue fear of criminal repercussions. *Id.* at 611. In extending its ruling to prohibit the use of official conduct evidence in charges premised upon unofficial conduct, the *Trump* Court highlighted its concern that if "official conduct for which the President is immune [is] scrutinized to help secure his conviction, even on charges that purport to be based only on his unofficial conduct, the 'intended effect' of immunity would be defeated." *Id.* at 631 *citing to Fitzgerald* at 756.

The *Trump* Court's decision was principally concerned with a President's ability to make decisions *and* to make those decisions for the public good. Based upon that concern, which Chief Justice Roberts refers to in various ways throughout the *Trump* decision, it is readily apparent that *Trump* addressed a very specific issue: "When may a former President be prosecuted for official acts taken during his Presidency?" *Id.* at 641. That is not the issue currently before this Court. The criminal charges here stem from the private acts of the Defendant made prior to taking the Office of the President – leaving only the question as to whether the *evidence* used to support the instant charges meet the official acts criteria as set forth by the *Trump* Court.

In the case at bar, the trial Court is thoroughly familiar with the legal and factual issues before it – having presided over every stage of the proceedings. And unlike *Trump*, both parties here have argued and now briefed the issues exhaustively. The record before this Court is complete and there is no need for further fact-finding or briefing.

The President of the United States has a duty to the citizenry that is paramount to each and every decision they make. "There accordingly 'exists the greatest public interest' in providing the President with the 'maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 611. This is to ensure the President can take "bold and unhesitating action" free from fear of unwarranted reprisal. *Id.* at 613. But a "President is not above the law." *Id.* at 642.

It is through this lens and pursuant to the guidance provided by the Supreme Court that this Court considers Defendant's CPL § 330.30(1) motion.

## PART III: ARGUMENTS OF THE PARTIES

Defendant moves to dismiss the indictment and vacate the jury verdict on the grounds that the People introduced evidence in the grand jury and at trial relating to Defendant's official acts as President, in violation of the Presidential immunity doctrine as pronounced by the Supreme Court

in *Trump*, and the Supremacy Clause.[6] Defendant further argues that the alleged violation is not subject to harmless error analysis and even if it were, the harm caused is irreparable. Defendant's Motion at pgs. 20, 41, 43.

Specifically, Defendant argues that certain "official-acts evidence" admitted at trial "concerned actions taken pursuant to 'core' Executive power for which 'absolute' immunity applies." *Id.* at pg. 2. Defendant further argues that should this Court find that Defendant is not entitled to absolute immunity, then "it is equally clear" that he is entitled to presumptive immunity because the evidence admitted at trial "fit[s] comfortably within" the outer perimeter of the President's authority and the People have failed to rebut this claim with evidence unrelated to motive as required by the *Trump* Court's Decision. *Id.* at pgs. 27, 29.

Defendant identifies the following evidence as improperly received at trial: private communications with Hope Hicks ("Ms. Hicks") as White House Communications Director; Office of Government Ethics Form 278e ("OGE Form 278e"); the observations of Madeleine Westerhout ("Ms. Westerhout"), Director of Oval Office Operations, regarding Defendant's "preferences and practices" in the Oval Office; the testimony of Michael Cohen ("Mr. Cohen") regarding his communications with Defendant and others about the presidential pardon power, testimony regarding a "pressure campaign," and testimony about his conversations with David Pecker ("Mr. Pecker") about a related Federal Election Commission (hereinafter "FEC") inquiry; and "five sets of posts from 2018 on President Trump's official White House Twitter account."[7] *Id.* at pg 14.

The People argue that Defendant failed to preserve the majority of his objections. The People further argue that should the Court consider the merits of the motion, despite the procedural bar, the evidence Defendant identifies is wholly unrelated to any official acts as President and thus, not entitled to any form of immunity whether it be in the grand jury or at trial. In the alternative, the People argue that the evidence at issue relates only to the outer perimeter of the President's authority which is entitled only to presumptive immunity, which the government has successfully rebutted

---

[6] Defendant previously raised a Supremacy Clause argument before Judge Hellerstein who, in his July 19, 2023, decision denying removal, held that Supremacy Clause "immunity requires the defendant to show both that he was performing 'an act which he was authorized to do by the law of the United States' and that, in performing that authorized act, 'he did no more than what was necessary and proper for him to do.'" *New York v. Trump*, 683 F.Supp.3d 334, [SD NY 2023]. Defendant failed to raise this argument in a timely post-judgment motion. Moreover, the issue of Supremacy was not implicated in *Trump* and therefore, that decision does not provide Defendant a new avenue for consideration by this Court of his current Supremacy Clause claim. In any event, this Court adopts Judge Hellerstein's reasoning and finding.

[7] This evidence is discussed in greater detail in the Discussion section below.

without inquiring into the President's motives in adherence with *Trump*. Finally, the People argue that if any of the evidence in dispute was admitted in violation of either immunity prohibition, the error was harmless in light of the overwhelming evidence of guilt.

## PART IV: CPL § 330.30(1)

"After rendition of a verdict of guilty and before sentence," a court may set aside a verdict if there is a ground in the record that, if raised on appeal, "would require a reversal or modification of the judgment as a matter of law by an appellate court." CPL § 330.30(1), Defendant's Motion at pg. 18; People's Response at pg. 8. A trial court's inquiry pursuant to § 330.30(1) is generally limited to a determination of whether the trial evidence was "legally sufficient to establish the defendant's guilt of an offense of which he was convicted." *People v. Carter*, 63 NY2d 530, 536 [1984]. A trial court must determine only "whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial in order to uphold the verdict." *People v. Bleakly*, 69 NY2d 490 [1987].

The only claim of error that can serve as a basis to set aside a verdict is one that was properly preserved for appellate review. *People v. Everson*, 100 NY2d 609 [2003]. Therefore, in the context of a CPL § 330.30(1) motion, an "argument may not be addressed unless it has been properly preserved for review during the trial." *People v. Hines*, 97 NY2d 56 [2001] citing to *People v. Carter*, 63 NY2d 530 [1984]. As reasoned in *People v. Hawkins*, 11 NY3d 484 [2008], "[s]ound reasons underlie this preservation argument. As we stated in *Gray*, a specific motion brings the claim to the trial court's attention, alerting all parties, in a timely fashion to any alleged deficiency in the evidence, thereby advancing both the truth-seeking purpose of the trial and the goal of swift and final determination of guilt or nonguilt of the defendant." *Hawkins*, 11 NY3d at 492, referencing *People v. Gray*, 86 NY2d 10 [1995]. To "preserve a claim of error in the admission of evidence or a charge to the jury, a defendant must make his or her position known to the court." *Gray*, 86 NY2d at 19.

## PART V: DISCUSSION

**Section A**. Preservation

The threshold issue this Court must consider then, is whether the claims of Presidential immunity were properly preserved for this Court's review.

The People argue that Defendant failed to preserve any claim of Presidential immunity as to the evidence in dispute other than the testimony of Ms. Hicks and OGE Form 278e. People's

Response at pgs. 6, 9-12. While Defendant claims that he preserved objections as to all evidence in his pre-trial filings and at trial, he also argues that the Court should overlook any failure to properly preserve in the "interest of justice" or for "good cause." Defendant's Reply at pg. 2. However, "good cause" and "interest of justice" are not legally viable standards for a CPL §330.30(1) review in the absence of proper preservation. *People v. Carter*, 63 NY2d 530 [1984] (Trial judges have no power to vacate a conviction on interest of justice grounds), *People v. Sudol*, 89 AD3d 499 [1st Dept 2011] (Trial court lacks Appellate Division jurisdiction and may only grant a motion where alleged error was preserved by proper objection at trial.)

Defendant also argues that *Trump* constitutes an intervening decision and therefore, provides an exception to the preservation requirement. Defendant's Reply at pgs. 1-2, 6. This Court disagrees. The New York Court of Appeals in *People v. Cabrera* emphasized that preservation is crucial except in the most limited of circumstances as it "gives the parties an essential opportunity to prove relevant factual and legal issues, thereby ensuring that the record before this Court reflects a full airing of the points that bear upon an ultimate merits determination." 41 NY3d 35, 43 [2023]. It further held that "preservation is essential where the failure to raise a claim in the court of first instance means that the appellate record is inadequate to fairly assess the merits, *even if governing law was altered by an intervening Supreme Court decision.*" *Id.* at 45 (emphasis added). The *Cabrera* court highlighted several New York Court of Appeals decisions that reiterated the need for preservation despite an intervening Supreme Court decision. For example, the Court of Appeals held in *People v. Martin*, 50 NY2d 1029 [1980], that the intervening Supreme Court decision in *Payton v. New York*, 445 US 573 [1980], which changed the law in New York regarding warrantless arrests inside the home, did not excuse a failure to preserve in the lower courts. The intervening decision in *Trump* equally does not excuse a failure by Defendant to adequately preserve his objections to the evidence he now claims was erroneously admitted.

Defendant also claims that the admission of what he has characterized as official acts evidence constitutes a "mode of proceedings" error which does not require preservation. Mode of proceedings errors occupy a very narrow set of claims. *People v. Patterson*, 39 NY2d 288 [1976]. To qualify, the error must "go to the essential validity of the process and [be] so fundamental that the entire trial is irreparably tainted." *People v. Kelly* 5 NY3d 116, 119-120 [2005]. "[M]ost errors of constitutional dimension" must be preserved in the trial court. *People v. Hanley*, 20 NY3d 601, 604-605. Examples of mode of proceedings errors include "changing of the burden of proof, consent to less than a 12-member jury in a criminal case, and deviation from State constitutionally mandated

10

requirements for an indictment." *Gray,* 86 N.Y.2d at 21-22. And more recently, the Court of Appeals held that notwithstanding the Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen,* 597 US 1 [2022], which "effected a substantial change in Second Amendment jurisprudence," and "raises significant questions about whether, in light of *Bruen,* lack of licensure is an essential element of New York's criminal possession of a weapon offense and must therefore be charged to the jury in all cases," it did not qualify as a mode of proceedings error. *People v. David,* 41 NY3d 90, 97 [2023]. The alleged errors here do not satisfy the narrow mode of proceedings exception.

As briefly summarized above, Defendant failed to seek a pre-trial ruling on the issue of Presidential immunity until March 7, 2024, less than three weeks before the scheduled start of trial.[8] Although Defendant argues that the Supreme Court's grant of *certiorari* on the issue of Presidential immunity on February 28, 2024, established the timeliness of his filing, that is not the case, as was thoroughly explained in this Court's Decision of April 3, 2024, which tracked the history of litigation in the instant matter and paralleled it with Defendant's immunity-based filings in his federal matters. That analysis established what can only be explained as Defendant's affirmative decision to not file a timely immunity-based motion here.

On April 15, 2024, the first day of jury selection, Defendant informed this Court of his intent to file another motion for preclusion of evidence on the grounds of Presidential immunity. Tr. 53-55. The following day, Defendant formally filed a pre-motion letter which incorporated by reference his March 7, 2024, submission.[9] In the April 16, 2024, letter, Defendant sought a pre-trial ruling on the grounds of Presidential immunity as to two specific areas of potential evidence, OGE Form 278e and certain social media posts later identified as People's Exhibits 407G through 407I. Defendant also made a sweeping reference to other categories of potential evidence, including "witness testimony regarding [Defendant's] official acts during time in Office, such as anticipated testimony from former White House staff regarding their communications with President Trump during his first term." On April 18, 2024, the People responded by letter arguing the Court should "adhere to

---

[8] The trial date was later adjourned to April 15, 2024, due to a discovery dispute.

[9] In his March 7, 2024, submission, Defendant sought an adjournment of the trial until a decision was rendered in *Trump,* or in the alternative, preclusion of any official acts evidence based on Presidential immunity. In that submission, he referenced three Twitter postings by Defendant from 2018, three public statements Defendant made in 2018 (none of which were introduced at trial), the U.S. Office of Government Ethics form submitted in 2018, testimony from Ms. Hicks regarding communications she had with Defendant between January 2017 and March 2018 and again from March 2020 to January 2021, and conversations between Mr. Cohen and Defendant in February 2017 and 2018 "Twitter posts" testified to by Mr. Cohen in the grand jury. Defendant's March 7, 2024 Motion pgs. 3-4.

its previous ruling" that Defendant's motion for pre-trial consideration was untimely and that the Court should instead rule on objections as they are made at trial. On April 19, 2024, this Court reiterated its previous ruling that the motion for a pre-trial ruling was untimely. Notwithstanding, this Court made clear that Defendant was not without recourse. To be clear, this Court did not preclude Defendant from objecting and seeking preclusion of proffered evidence he believed to be in violation of the Presidential immunity doctrine. Decision on the merits of such objections was merely deferred until an actual objection was voiced at trial. "[W]e are going to wait until trial and *you can make your objections at that time*. Both of you have already made your arguments in the letters, so *the Court will decide it at the time of trial when the objection is made*." Tr. 802 (emphasis added).

In accordance with this Court's ruling, Defendant preserved his claim with respect to the testimony of Ms. Hicks as to "statements by Defendant while he was President of the United States" by making a timely objection prior to her testimony. Indeed, on May 3, 2024, immediately after the People called Ms. Hicks to the stand and before the start of her direct examination, the following colloquy took place:

"MR. BOVE: May I approach?

THE COURT: Sure.

MR. BOVE: Thank you. Judge, I am sorry. We want to put on the record our objection on Presidential immunity grounds. I expect there will be testimony from Ms. Hicks related to statements by President Trump while he was President of the United States. Unless you tell me it is necessary, I prefer not to lodge the objections question by question. We object to the subject of her testimony based on the authorities we submitted, and our position being that the testimony is evidence of official acts being presented at a criminal trial against the President, and it should be precluded.

MR. COLANGELO: I don't anticipate we will be showing any exhibits that fall within that category. We intend to elicit testimony, and we have briefed at length the argument that the rule of inadmissibility that Mr. Bove just described does not exist and is not a rule. The inadmissibility rule was not a rule that was ever recognized. Several cases that we have cited has held the exact opposite in the analogous context of consular immunity. As we cited in other papers holding that evidence of otherwise immune conduct is nonetheless admissible in a trial regarding criminal conduct for non-immune acts. So, the testimony we intend to elicit involves statements by the Defendant, and there is no doctrine that would allow excluding it.

12

THE COURT: I believe I ruled on this as well. So the objection is noted. I don't think you need to object as to each question.

MR. BOVE: Thank you, Judge." Tr. 2120-2122.

Therefore, this Court agrees that the objection was properly preserved as to the testimony of Ms. Hicks pertaining to official acts. Defendant identifies the official acts evidence as "President Trump's private conversations with the White House Communications Director," and separates those conversations into four specific communications. Defendant's Motion at pgs. 2-3, 9-11. Although Defendant now appears to expand his objection to include "[a]ll of Hicks's testimony concerning events in 2018,"[10] there is no reference in the testimony to any alleged official acts other than the four he has identified. In fact, of the 98 pages of transcript memorializing Ms. Hicks's testimony, only 11 pages pertain to the four instances identified by Defendant. Those four objections are preserved and will be addressed individually in the discussion section below.

Defendant objected at trial and properly preserved his Presidential immunity claim with respect to Form OGE 278e. Tr. 2369-2370, People's Exhibit 81.

Defendant failed to object to the testimony of Ms. Westerhout on the grounds of Presidential immunity at any time during the course of the trial and thus, his current claim as to her testimony is unpreserved.

Likewise, Defendant failed to preserve the majority of his Presidential immunity claims with respect to Mr. Cohen's testimony. The subject matter of all of Defendant's claims in the instant motion relate to a so-called "pressure campaign," statements relating to an FEC investigation, and lastly, statements related to Mr. Cohen's testimony before Congress and the Special Counsel's investigation into alleged Russian interference in the 2016 presidential election. Defendant's Motion at pgs. 12-16, 33-40. According to the People, the pressure campaign referred to measures taken by Defendant while President and others, to "dissuade Cohen from cooperating with investigations into the payments to McDougal and Stormy Daniels." People's Response at p. 4. The People sought to introduce evidence of a pressure campaign for three purposes: to demonstrate Defendant's consciousness of guilt, to rebut Defendant's claim that certain witnesses, including Mr. Cohen, were benefitting from their testimony, and to explain to the jury why certain witnesses, including Mr. Cohen, at various times denied certain allegations which they later recanted and acknowledged as true. Tr. 41-58. Defendant sought a pre-trial ruling to exclude evidence of the pressure campaign on

---

[10] Defendant's Motion at pg. 26.

the grounds that such evidence violated the Presidential immunity doctrine, as well as on relevance and other evidentiary grounds. While this Court declined to rule on Defendant's motion on his Presidential immunity claims as untimely, this Court agreed with Defendant on the other evidentiary grounds and in its Decision and Order on Defendant's Motions *in limine*, dated March 18, 2024, excluded testimony about the alleged pressure campaign unless and until such time as Defendant opened the door to such testimony.

Opening statements commenced on April 22, 2024. In his opening statement, Defendant raised the very subject this Court had earlier cautioned would likely open the door to testimony about the alleged pressure campaign. As a result, on April 30, 2024, before introducing certain evidence, the People renewed their request for permission to elicit testimony about the pressure campaign. Tr. 1652. The Court entertained extensive argument whether Defendant had in fact opened the door to such testimony and if so, the purpose for which it could be introduced. Tr. 1652-1662. Defense counsel ultimately agreed that the testimony could properly be elicited to advance the People's theory of the alleged pressure campaign, but maintained his objection that it should not come in to prove consciousness of guilt. "So, with respect to the other proffered reasons for some of this testimony to counter financial benefits to Mr. Cohen and Ms. Daniels and to explain why they changed their story, that makes sense. And I think they are going to talk about that on direct, but consciousness of guilt is of a different order, in our view." Tr. 1660. As a result, this Court modified its previous ruling to the extent that the testimony would be permitted for the limited purpose of rebutting the challenges to Mr. Cohen's, and others', credibility, but could not be introduced as evidence of consciousness of guilt. Tr. 1661-1662. Defendant thereafter objected to the introduction of People's Exhibits 407F through 407I, immediately prior to their introduction.[11] Tr. 3167-3168. Thus, Defendant's claim as to these exhibits was properly preserved. However, at no time immediately prior to, or during, Mr. Cohen's testimony did Defendant voice any further objections to official acts evidence on Presidential immunity grounds. Thus, the remaining claims are not preserved.

The record is clear that Defendant did not make any Presidential immunity-based objections at trial other than those identified above, and Defendant concedes as much. However, Defendant

---

[11] During the lengthy colloquy addressing the purported pressure campaign on April 30, 2024, defense counsel made a passing reference to Defendant's April 16, 2024, filing which included Presidential immunity claims as to People's Exhibits 407F through 407I. On May 10, 2024, Exhibits 407F through 407I were offered into evidence. In lieu of making a speaking objection or requesting a sidebar, the objection voiced by Defendant was "Your Honor, the same objection as discussed last week." Giving broad deference to Defendant and every benefit of the doubt, this Court will recognize an objection Defendant made on Presidential immunity grounds, ten days prior on April 30, 2024, as to exhibits 407F through 407I.

claims that he preserved his Presidential immunity claims in pre-trial submissions and was thus not required to object to each piece of evidence when it was offered. This argument not only ignores this Court's clear pre-trial ruling directing him to do precisely that which he now claims he was not required to do, but is contrary to the law. CPL § 470.15(4)(a) is clear that a ruling or instruction of the court must be duly protested by the defendant. *See Gray*, 86 NY2d at 19 ("[I]n order to preserve a claim of error in the admission of evidence or a charge to the jury, a defendant must make his or her position known to the court."). If Defendant genuinely believes that his pre-trial filings satisfy his preservation requirement, it begs the question why he nonetheless voiced a clear objection prior to the testimony of Ms. Hicks? Equally confounding is Defendant's explanation for objecting to the admission of OGE Form 278e as a mere effort "to make clear that [Defendant] maintained the immunity objection as to *documentary* official acts." Defendant's Reply at pg. 5 (emphasis added). This argument is unavailing. In essence, Defendant's argument is that preservation is achieved by voicing a single objection to testimonial evidence he seeks to preclude, presumably the one made prior to the testimony of Ms. Hicks, and a corresponding single objection to documentary evidence, the OGE Form 278e. This is simply not the law. A general motion to preclude "witness testimony" prior to trial, which this Court did not rule on, does not satisfy the obligation of counsel to make timely objections. Again, under Defendant's theory, a defendant need only register a single general objection to testimonial evidence – such as hearsay, for example - at the start of trial and another objection to hearsay contained in documents, to preserve any and all hearsay objections for the entirety of a six-week trial. This argument not only ignores settled law, it also ignores the practical rationale for the preservation requirement in the first place.

With respect to Ms. Westerhout, Defendant did not object to her testimony on Presidential immunity grounds either in pre-trial submissions or at trial. Defendant argues that he preserved an objection in his pre-trial filings, apparently referring to a broadly worded general objection to the introduction of official acts evidence contained in his March 7, 2024, pre-trial motion. That objection lacked any specificity and referred generally to the testimony of witnesses. It is not for a trial court to independently identify, without guidance from counsel, the evidence a party finds objectionable. Lastly, Defendant claims he did not object to Ms. Westerhout's testimony, as he had done prior to the testimony of Ms. Hicks, to "avoid antagonizing the court or testing its patience." Defendant's Reply at pg. 5. However, an examination of the trial record demonstrates that this Court did not curtail counsel or limit his right to object. In fact, the record demonstrates that counsel objected approximately 170 times during the course of the trial.

15

Because Defendant failed to timely object to Ms. Westerhout's testimony about Defendant's "work habits," "preferences," "relationships and contacts," and "social media" practices at the White House,[12] the motion to set aside the verdict on those grounds is denied as unpreserved. Because Defendant failed to timely object to Mr. Cohen's testimony other than that relating to People's 407F through 407I, the motion to set aside the verdict on those grounds is denied as unpreserved.

Despite Defendant's failure to preserve the objections he raises in the instant motion, other than those pertaining to Ms. Hicks and Exhibits 407F through 407I, this Court will nonetheless consider his motion on the merits, in its entirety.

**Section B**: Official and Unofficial Acts

Unlike *Trump*, this court need not decide whether the crimes of which Defendant was convicted constitute official acts because Defendant concedes that they were decidedly unofficial. The much narrower issue presented here is whether a discrete subset of evidence admitted at trial constituted official acts deserving of some level of immunity, whether it be absolute or presumptive. To evaluate each of those claims, it is important to understand the context of the unofficial acts for which Defendant stands convicted.

The evidence adduced at trial established that a meeting between Defendant, Mr. Pecker, Chairman of American Media, Inc. ("AMI"),[13] and Mr. Cohen, took place in 2015 in Trump Tower. At that meeting, the three participants conspired to influence the 2016 presidential election. The scheme required that Mr. Pecker publish positive stories about Defendant to promote his presidential candidacy. Mr. Pecker would also prevent publication of negative stories about Defendant by acquiring the stories and not publishing them. Mr. Pecker would also, among other things, publish negative stories about rival presidential candidates. The jury heard evidence that various stories were published by AMI in accordance with this agreement. The jury also heard about two stories that were obtained to prevent their publication. The stories were purchased subject to non-disclosure agreements ("NDAs") to prevent the public from hearing the allegations contained therein. One NDA was executed between AMI and Karen McDougal ("Ms. McDougal"), a woman who claimed to have had an affair with Defendant prior to his campaign for the presidency. A second NDA was executed between Mr. Cohen, on behalf of Defendant, and Stormy Daniels ("Ms.

---

[12] Defendant's Motion at pgs. 31-33.

[13] American Media is a publishing company that publishes celebrity and health and fitness magazines, including The National Enquirer, the Globe, Life & Style, In Touch, Closer, Us Weekly, Shape and Muscle, and Fitness and Flex. Tr. 914.

Daniels") a/k/a Stephanie Clifford, an adult film actress who alleged to have had an intimate encounter with Defendant in 2006.

With respect to Ms. McDougal, the funds to pay the NDA were provided by AMI. With respect to Ms. Daniels, the funds to effectuate the NDA were provided by Mr. Cohen on behalf of Defendant. The testimony further established that Defendant reimbursed Mr. Cohen for those payments with checks he signed and authorized in 2017 when he was President. Those checks and the financial documents related to the checks, falsely reflected the payments as retainer fees for Mr. Cohen in his capacity as private counsel to Defendant and not as reimbursement for Mr. Cohen's payment to Ms. Daniels.

Turning now to the evidence at issue, this Court must first determine whether certain evidence admitted through Ms. Hicks, Ms. Westerhout and Mr. Cohen as well as postings by Defendant on social media, and financial disclosure form OGE Form 278e for 2017 reflected official acts subject to absolute immunity.

In *Trump*, the majority identified only one instance of official conduct entitled to absolute immunity and remanded the matter for the District Court to conduct the remainder of the analysis as to all other conduct at issue.[14] The Court provided guidance to the District Court to assist in differentiating between official and unofficial acts, noting, in part, that "[i]t is the nature of the function performed, not the identity of the actor who perform[s] it, that inform[s] our immunity analysis." *Trump* at 2322 quoting *Forrester v. White*, 484 US 219, 229 [1988].

As noted by Justice Coney-Barrett in her concurrence in part, in the absence of precedent directly on point, the use of a hypothetical is a highly useful legal tool and one would be hard-pressed to devise a hypothetical more on point to guide the analysis between official and unofficial conduct than the case at bar: is a President's in-office conduct to conceal payments to an adult film actress to keep information from the public eye relating to an encounter that occurred prior to his Presidency official or unofficial?

While Judge Hellerstein in the Southern District of New York did not conduct the type of full-throated analysis proscribed by *Trump* because the Notice of Removal he considered was filed well before Trump was decided, he nonetheless did analyze some of the conduct at issue here. In rejecting Defendant's Supremacy claim *in the instant matter*, Judge Hellerstein concluded that "[r]eimbursing Cohen for advancing hush money to Stephanie Clifford cannot be considered the

---

[14] *Trump* held that Defendant is accorded absolute immunity with respect to the specific conduct alleged in that indictment involving his discussions with Justice Department officials. *Trump* at p. 15.

17

performance of a constitutional duty," and "[f]alsifying business records to hide such reimbursement, and to transform the reimbursement into a business expense for [defendant] and income to Cohen, likewise does not relate to a presidential duty." *Trump*, 683 FSupp3d at 347.

It is therefore logical and reasonable to conclude that if the act of falsifying records to cover up the payments so that the public would not be made aware is decidedly an unofficial act, so too should the communications to further that same cover-up be unofficial.

### Testimony of Hope Hicks

Ms. Hicks was Director of Communications for the Trump Organization beginning in October 2014. In January 2015, she transitioned to the position of Press Secretary for Defendant's campaign in his run for President. Tr. 2126-2127, 2136. She testified at trial about certain allegations that became public during the final days of the campaign that cast Defendant in a negative light. She further testified about the manner and extent to which she participated in Defendant's response to the allegations. Ms. Hicks worked in the White House from January 20, 2017, until April 2018, and returned in March 2020 until January 2021. Her first position was Director of Strategic Communications. In that role she "worked closely with – with the communications team and the press team on message development and organizing events to help showcase Mr. Trump's accomplishments, the agenda of the Administration. I worked closely with Mr. Trump on media opportunities for him." Tr. 2208. In August 2017, Ms. Hicks assumed the position of Communications Director. Tr. 2207-2208. In that role, she "oversaw the team," "coordinating all of the communication efforts for the Administration from the White House throughout all of the agencies, and making sure that each of [sic] principals of the agencies and the agencies themselves were prioritizing Mr. Trump's agenda, and that we were all working together to maximize the impact of any positive messages that we were trying to get out and share with the American people" and "capitalize on any opportunities to showcase Mr. Trump and his work, the President in a good light." Tr. 2210.

Defendant argues that in her roles at the White House, any communications between Ms. Hicks and Defendant must receive absolute immunity pursuant to the Take Care and Vesting Clauses, as Defendant's ability to speak freely to Ms. Hicks was a core function of the Executive. According to Defendant, because Ms. Hicks wielded executive power on his behalf, authority that exists pursuant to Article II of the Constitution, any communications he had with her are subject to absolute immunity, or at the very least, presumptive immunity. The People argue that the

18

communications Defendant had with Ms. Hicks, which are the subject of this motion, constitute unofficial acts not entitled to any level of immunity and submit that even if the Court were to find that the communications fall within the outer perimeter of Defendant's authority, subject to presumptive immunity, that presumption has been rebutted by ample evidence unrelated to motive as required under *Trump*.

Defendant identifies four communications. Defendant's Motion at pgs. 9-11.[15] They are as follows:

Hicks 1: Ms. Hicks testified she was aware that on March 20, 2018, Ms. McDougal sued AMI over the NDA she entered into with AMI. People's Exhibit 319 is a text message between Ms. Hicks and Ms. Westerhout, then Executive Assistant to Defendant as President. The text was sent on March 20, 2018, the same day the lawsuit was filed. In the text, Ms. Westerhout asks Ms. Hicks, "Hey. The President wants to know if you called David Pecker again?" That was the extent of Ms. Hicks's testimony about that text. Tr. 2210-2213.

Hicks 2: Ms. Hicks testified that shortly after the McDougal lawsuit was filed, Ms. McDougal was interviewed on CNN by Anderson Cooper. Ms. Hicks testified that following that interview, she spoke with Defendant "about the news coverage of the interview, how it was playing out." Ms. Hicks did not testify as to any actual statements Defendant made to her. Tr. 2214-2215. There was no further testimony from Ms. Hicks regarding this interaction with Defendant.

Hicks 3: Ms. Hicks testified about a January 2018 inquiry by the Wall Street Journal ("WSJ") regarding a story it planned to publish about the alleged sexual encounter between Defendant and Ms. Daniels and the NDA which was executed in 2016 in the days leading up to the election. Tr. 2215-22. In her testimony, Ms. Hicks stated that she discussed the story with Defendant and "how to respond to the story, how he would like a team to respond to the story." Tr. 2217. She further testified about the following statements attributed to a White House official in that WSJ article: "[t]hese are old, recycled reports, which were published and strongly denied prior to the election" the official "declined to respond to questions about an agreement with Ms. Clifford." Tr. 2218, People's Exhibit 181. Ms. Hicks testified she was not the official, but that she had "discuss[ed] this statement" with Defendant before it was issued.[16] Tr. 2218-2219.

---

[15] The four communications were not introduced in chronological order. They will be addressed here in the order in which they came into evidence at trial.

[16] Ms. Hicks testified that she was not certain, but that the official referenced was likely the Deputy Press Secretary. Tr. 2218.

Hicks 4: Ms. Hicks testified about a February 2018 conversation she had with Defendant about a statement attributed to Mr. Cohen in a New York Times ("NYT") article the day before. Tr. 2219. In the article, Mr. Cohen is reported as stating, among other things, that he made a payment to Ms. Daniels without Defendant's knowledge. Ms. Hicks further testified that Defendant told her:

"[h]e spoke to Michael, and that Michael had paid this woman to protect him [Defendant] from a false allegation, um, and that – you know, Michael felt like it was his job to protect him, and that's what he was doing. And he did it out of the kindness of his own heart. He never told anybody about it. You know. And he was continuing to try to protect him up until the point where he felt he had to state what was true." Tr. 2219-2220.

She further testified that Defendant told her:

"that he thought it was a generous, um, you know, thing to do, and he was appreciative of the loyalty," and that Defendant "wanted to know how it was playing, and just my thoughts and opinion about this story versus having the story – a different kind of story before the campaign had Michael not made that payment," and that Defendant's "opinion was it was better to be dealing with it now, and that it would have been bad to have that story come out before the election." Tr. 2220-2221.

Defendant's argument that any communication he had with Ms. Hicks is subject to absolute immunity by virtue of the position she held in the White House is mistaken. "It is the nature of the function performed, not the identity of the actor who perform[s] it, that inform[s] our immunity analysis." *Trump* at 2322 quoting *Forrester v. White*, 484 US 219, 229 [1988]. Indeed, the President himself may speak in his unofficial capacity as a candidate or party leader, and certainly he can do so in his private capacity as well. Any argument that private conduct transforms into official conduct by communicating about the same to an individual with a particular title is without merit. Analysis of the trial record demonstrates that Hicks 1 through 4 reflect communications - or mere topics of communications - which manifestly pertain to unofficial or private conduct and are inextricably intertwined with private discussions and events which began before Defendant's Presidency.

All four instances relate to pre-inauguration intimate interactions between Defendant and two different women, and the ongoing effort to conceal those interactions post-inauguration. Defendant's attempts to sweep these communications under the protections afforded by the Take Care and Vesting Clauses is unpersuasive and Defendant has not referenced any Constitutional authority upon which he was acting for any of the four communications with Ms. Hicks.

20

The personal nature of Hicks 1 through 4 is made even clearer when viewed alongside testimony introduced through Mr. Pecker. To begin, Mr. Pecker's testimony reflected that his relationship with Defendant was a personal one and remained so after the inauguration. Mr. Pecker served no government function at any time, official or otherwise. Further, Mr. Pecker's testimony tracked the same subject matter as that referenced in Hicks 1 through 4, yet Defendant did not and could not make a single immunity-based objection to it prior to, during, or after trial. Tr. 1228-1231 (communications between Defendant-President and Mr. Pecker regarding Mr. Pecker's pre-election assistance with the "McDougal matter"); Tr. 1236-1238, 1239 (communications between Defendant-President and Mr. Pecker regarding Ms. McDougal's interview with Anderson Cooper); Tr. 1238-1239 (phone call between Mr. Pecker and Ms. Hicks relating to extending Ms. McDougal's employment contract with AMI so "she would not go out and give any further interviews or talk to the press or say negative comments about American Media or about [President] Trump."). In fact, Hicks 1 through 4 perfectly track the unobjected to conversations previously testified to by Mr. Pecker.

A finding that Hicks 1 through 4 constitute unofficial conduct is consistent with the holding and policy concerns expressed by the Court in *Trump*. Conversations and meetings with a White House Communications Director about personal matters involving an alleged affair and a sexual encounter that occurred prior to taking the Office of the President of the United States are undoubtedly not the "greatest public interest[s]" the Supreme Court contemplated when it wrestled with protecting a President's ability to "deal fearlessly and impartially with the duties of his office." *Trump* at 611, citing *Fitzgerald*, 457 US at 750 quoting *Ackerman*, 444 US at 203.

Defendant's argument that these communications fall at least within the outer perimeter of his authority also fails. The testimony was most certainly palpably beyond any actual authority Defendant possessed in his capacity as President.[17] However, even if this Court were to find that the communications do fall within the outer perimeter of his Presidential authority, it would also find that other, non-privileged trial testimony provided ample non-motive related context and support to rebut a presumption of privilege and that Defendant was acting in his personal capacity and not

---

[17] Contrary to Defendant's interpretation, the Supreme Court in *Clinton* did not hold that a President's communications with his private attorney, thereafter, shared with the public, are within the outer perimeter of his authority. The Court definitively stated that that issue was not before it. *Clinton v. Jones*, 520 US 681, 686 [1997].

pursuant to his authority as President. Nor does the introduction of that evidence pose any danger of intrusion on the authority and function of the Executive Branch.

### Testimony of Madeleine Westerhout

Ms. Westerhout testified that she had been employed by the Republican National Committee for three and one-half years until January 2017 when she joined the transition team for Defendant as President-elect. She then worked as Special Assistant to the President and later as Executive Assistant to the President. Tr. 2984. Her function was to assist Defendant in various ways, primarily by facilitating communications with other parties – both personal and professional. Tr. 2984-2996. In the transition year, she engaged often with Rhona Graff, who had been Defendant's Executive Assistant at the Trump Organization, in part, to ensure Ms. Westerhout had access to Defendant's personal contact list. She further testified about Defendant's work habits and preferences, including how and in what form he communicated on social media.

Defendant argues that the introduction of Madeleine Westerhout's testimony relating to "presidential practices" including "work habits," "preferences," "relationships and contacts," and "social media practices" violated the Presidential immunity doctrine. Defendant's Motion at pgs. 11-12, 31-32.

As previously noted, objection to Ms. Westerhout's testimony was unpreserved and thus unreviewable. Nonetheless, as an alternative holding, this Court finds that the argument also fails on the merits because her testimony reflected unofficial conduct in its entirety.[18]

It bears noting that before Ms. Westerhout testified, it was Defendant who first elicited testimony about Defendant's work habits and practices from Ms. Hicks on cross-examination as excerpted below:

> Defense Counsel: And that office that you described the Oval Office and the area around it, that was a very hectic space in 2017, right?
> Ms. Hicks: Yes.
> Defense Counsel: And it sounds like for a period of time when you had that job, you could see from where you were sitting the resolute desk?
> Ms. Hicks: Yes.
> Defense Counsel: That's where the President sat?
> Ms. Hicks: Yes.
> Defense Counsel: When he was acting as President, right?

---

[18] In fact, defense counsel stated he had "no objection" to the People's request to introduce a contact list provided to Ms. Westerhout by Trump Organization employee Rhona Graff at the White House. A line of questioning Defendant now claims was inadmissible. Tr. 3001.

22

Ms. Hicks: That's right.

Defense Counsel: So you got a sense of how chaotic that environment was day to day, right?

Ms. Hicks: Uh-huh. That particular area wasn't necessarily chaotic in a bad way. I just want to clarify. It was very busy. There was a lot going on. There were certainly parts of the experience that were chaotic, but he was constantly moving.

Defense Counsel: People were working very hard to make it not chaotic and keep it orderly?

Ms. Hicks: Yes.

Defense Counsel: But, the fact is, there were many meetings and a lot going on, right?

Ms. Hicks: Yes.

Defense Counsel: And from where you sat, you could see that the President was frequently multitasking, right?

Ms. Hicks: Yes.

Defense Counsel: And people were interrupting what he was doing, right?

Ms. Hicks: Yes.

Defense Counsel: Different priorities would get called out to his attention and he would pivot?

Ms. Hicks: That's right.

Tr. 2239-2240.

Ms. Westerhout's testimony on direct examination, and further explored on cross-examination, paralleled the cross-examination of Ms. Hicks regarding Defendant's work habits and presidential practices. Defense Counsel repeated the strategy when he cross-examined Ms. Westerhout. Through his cross-examination of Ms. Westerhout and Ms. Hicks (as well as Rhona Graff)[19], counsel created a record from which he later argued that Defendant was not fully cognizant of the nature of the checks he signed, which formed the basis for 11 of the 34 counts he was convicted of, because he was busy multi-tasking as President of the United States. Tr. 4484-4487. In fact, counsel's cross-examination of Ms. Westerhout delved much further into Defendant's "work habits" than did her testimony on direct examination:

Defense Counsel: And so, would you see him signing things without reviewing them?

Ms. Westerhout: Yes.

Defense Counsel: And would you see him signing checks without reviewing them?

Ms. Westerhout: Yes.

Defense Counsel: And you would see him signing checks while he was on the phone; right?

Ms. Westerhout: Yes.

Defense Counsel: Would you see him sometimes signing checks when he was meeting with people?

Ms. Westerhout: Yes.

Defense Counsel: And there were different types of people that he was meeting with; right?

Ms. Westerhout: Yes.

---

[19] Defendant also pursued this line of questioning regarding Defendant's practice of multi-tasking while signing checks in his cross-examination of Rhona Graff, Executive Assistant to Defendant at the Trump Organization. Tr. 1523-1524.

Defense Counsel: Sometimes he was meeting with the top foreign leaders in the world; right?
Ms. Westerhout: Yes, uh-huh.
Defense Counsel: And other times he was meeting with you?
Ms. Westerhout: Yeah, uh-huh.
Defense Counsel: And so, he wouldn't be signing the checks when he was meeting with the top people in the world?
Ms. Westerhout: Yes.
Defense Counsel: But maybe when he was meeting with you, talking about something else, he would also be signing documents?
Ms. Westerhout: Yes, talking about the schedule or anything that had been going on.
Defense Counsel: The Chief of Staff that he would be meeting with?
Ms. Westerhout: Yes.
Defense Counsel: And other people, he would be doing that?
Ms. Westerhout: That's right.
Defense Counsel: He was a person who multitasked; right?
Ms. Westerhout: Definitely.
(Tr. 3114-3115).

Indeed, counsel established through his cross-examination of Ms. Westerhout, that her coordination with Trump Organization employee Rhona Graff to obtain Defendant's contact list was decidedly a personal and not a professional function.

Defense Counsel: And you were asked by the Prosecutor if you were – if you coordinated with the Trump Organization during that first year by asking questions of the Trump Organization employees; right?
Ms. Westerhout: Yes.
Defense Counsel: The person that you coordinated with most was Rhona Graff; right?
Ms. Westerhout: Yes.
Defense Counsel: And this did not have to do with the Trump Organization business; did it?
Ms. Westerhout: No.
Defense Counsel: It had to do with his personal affairs; right?
Ms. Westerhout: Yes, uh-huh.
Defense Counsel: For example, you needed his contact list; right?
Ms. Westerhout: Yes, uh-huh.
[…]
Defense Counsel: So that first year you spent a lot of time talking with Rhona Graff; right?
Ms. Westerhout: Yes.
Defense Counsel: But you did not spend time talking with the Trump Organization employees to coordinate business of the Trump Organization; right?
Ms. Westerhout: No, uh- uh.
Defense Counsel: It was just personal aspects for President Trump; right?
Ms. Westerhout: That's correct.
(Tr. 3036- 3037).

24

This is not to say that Ms. Westerhout could never engage in communications subject to Presidential immunity. However, just as was the case with Ms. Hicks, Ms. Westerhout's mere role as Executive Assistant does not *per se* cloak her communications and observations of the President with absolute immunity. Indeed, defense counsel identified certain portions of her testimony as pertaining to private matters. Ms. Westerhout's testimony about her observations that Defendant preferred to work in a dining area rather than at the Resolute Desk, or that he preferred to use a *Sharpie* marker over a ball point pen does not create an unacceptable risk of "undue pressures or distortions" to a President's work. *Trump* at 615. Nor does a reference to the fact that Defendant carried papers when he boarded Air Force One or Marine One – or that he multi-tasked when he met with his Chief of Staff – elevate her observations to the level of a National Security concern.

Defendant alleges that the People "forced" Ms. Westerhout, through an "invasive" direct examination, to reveal details about how the Defendant operated the Executive Branch, for example, "[Defendant] liked speaking with people in person or on the phone," he "liked to read," "[h]e liked hard copy documents," and he took "[a] lot" of calls each day from as early as 6:00 am until "late into the night." Simply stated, Ms. Westerhout's testimony about these observations do not concern the "core Commander In Chief power […] for which 'absolute' immunity applies." Defendant's Motion at pg. 32.

As Ms. Westerhout's testimony did not reference any official conduct, no level of immunity applies. As an alternative finding, even if the testimony did pertain to conduct falling within the outer perimeter of his Presidential authority subject to presumptive immunity, this Court finds that the People have once again rebutted that presumption without invoking the motive for the conduct.

**Office of Government Ethics Form 278e**

Defendant argues that the introduction into evidence of the OGE Form 278e submitted in 2018 (People's Exhibit 81) violated the Presidential immunity doctrine because completion of the form constitutes an official act. OGE Form 278e is an Annual Financial Disclosure Report required to be submitted to the Office of Government Ethics.

Trump Organization Senior Vice President and Controller Jeff McConney, testified that Form 278e is a "Conflict of Interest Form that the Government requires certain individuals to file annually, semi-annually" and that the Defendant filed the form since "when he declared his candidacy in 2015" through January 2017 when Defendant was no longer working at the Trump Organization. Mr. McConney testified that he worked on that form on behalf of Defendant before

25

he became President for "each year [Defendant] was a candidate or a Federal official." Tr. 2366-2368.

Defendant concedes that the President is not the only person required to complete OGE Form 278e as it is a Conflict of Interest Form for high-level federal officials. Defendant's Motion at pg. 40 citing 5 C.F.R. § 2634.104(a). Thus, simply because Defendant signed the form when in office does not dictate that such function falls within the outer perimeter of his authority. While Defendant's statement that he "was required to make the disclosures on the Form in his official capacity as President" may be true, the disclosures were not made pursuant to his conclusive and preclusive authority. Rather, he did so because the President is one of the federal employees required to complete the Form in the same way that he was required to complete the Form when he was merely a Presidential candidate. As *Trump* made clear, even communications between the President and Vice President must be analyzed to determine whether they constitute official acts protected by the Presidential immunity doctrine. A financial disclosure form that is required to be prepared and filed by other federal government employees cannot be subject to Presidential immunity. Further, no decision-making authority is implicated by the filing of the document other than the decision whether to comply with the requirement, and to complete the form truthfully, the same decisions all other mandated federal employees must make with respect to Form 278e.

As OGE Form 278e does not require communications from Defendant that are within his exclusive and preclusive Article II authority, or within the outer perimeter of his authority, the statements by Defendant on that form are not deemed official conduct and thus, receive no immunity.

### Testimony of Michael Cohen

Mr. Cohen testified that he was employed as Executive Vice President and Special Counsel to Defendant at the Trump Organization from 2007 to January 2017. He participated in the Trump Tower meeting with Defendant and Mr. Pecker in 2015 and thereafter, engaged in conduct in furtherance of the agreement made at that meeting. The conduct included communicating with Mr. Pecker and other employees of AMI, and other individuals who possessed information deemed harmful to Defendant's campaign. This was all carried out at the direction of Defendant. Mr. Cohen testified that, among other things, he executed an NDA with Ms. Daniels on behalf of Defendant to prevent her account from becoming public in the weeks prior to the November 2016 election. He further testified that he paid Ms. Daniels through her attorney, to effectuate the terms of the NDA

26

and that he did so on behalf of Defendant. Mr. Cohen further testified that he left the Trump Organization to become Personal Attorney to the President following Defendant's inauguration, and at no time did he have a position in the White House or anywhere else in government. Tr. 3475, 3494-3495. Mr. Cohen testified that he did not receive any salary or retainer in his position as Defendant's Personal Attorney. Tr. 3499-3501. Rather, Mr. Cohen benefited financially from his role because it created other financial opportunities for him. Tr. 3500. Mr. Cohen testified that Defendant reimbursed him with checks in 2017 for the payment he made to Ms. Daniels. The checks falsely purported to represent payments on a non-existent retainer agreement and the reimbursement was structured that way to conceal the payment Mr. Cohen made to Ms. Daniels, to prevent her allegations from becoming public and to influence the 2016 Presidential election.

Notwithstanding these efforts to conceal the true nature of the payments, testimony from various witnesses established that the allegations by Ms. McDougal about an affair and Ms. Daniels about a sexual encounter, became public after Defendant was sworn in as President of the United States. Initially, Mr. Cohen claimed over the course of many months, that Defendant knew nothing about the NDA or the payments to Ms. Daniels. Later however, he recanted, informing others, including various federal and state prosecutors, that Defendant was indeed aware of and in fact, authorized the payment to Ms. Daniels and that he later reimbursed Mr. Cohen in the manner described above.

Mr. Cohen testified that his representations, and at times prior sworn testimony, changed in the months following disclosure of the NDA and the related reimbursement checks. The People gave prior notice, and introduced evidence of, a "pressure campaign" Defendant mounted to compel Mr. Cohen to remain silent as to the agreement and Defendant's complicity in the efforts to influence the 2016 election. This Court initially precluded testimony about the pressure campaign in its entirety, but later qualified that should Defendant "open the door," the Court would permit its introduction for the limited purpose of rehabilitating Mr. Cohen's credibility to explain why Mr. Cohen had initially denied that Defendant knew about the scheme but later recanted and affirmed that Defendant was indeed complicit. On April 30, 2024, the People argued that the door had been opened by Defendant in his opening statement and that the evidence should be allowed in as per the Court's earlier ruling and caution. This Court agreed the door had been opened and permitted the evidence to be introduced to rebut Defendant's attacks on Mr. Cohen's credibility. The evidence of

a pressure campaign came in the form of testimony from Mr. Cohen, e-mails from and to Robert Costello,[20] an attorney, and other evidence including Twitter posts by Defendant.

Defendant argues that the following communications introduced through Mr. Cohen constitute evidence of official-acts subject to absolute immunity:

Cohen 1: Mr. Cohen's testimony regarding his prior testimony before the House Permanent Select Committee on Intelligence on Russian interference in the 2016 election. At trial, Mr. Cohen testified that he "was staying on Mr. Trump's message that there was no Russia-Russia-Russia and again, in coordination with the Joint Defense Team, that's what was preferred," to explain why he was untruthful to Congress. Defendant argues that Mr. Cohen's trial testimony, that he "felt" he "needed" what the People described as "the power of the President" to "protect" him in connection with his testimony before Congress, violated the Presidential immunity doctrine. Defendant's Motion at pgs. 12-13.

Cohen 2: An e-mail sent on June 13, 2018, by Robert Costello to Mr. Cohen stating, in part, "What you do next is for you to decide, but if that choice requires any discussion with my friend's client, you have the opportunity to convey that this evening, but only if you so decide." Mr. Cohen testified on direct examination that he interpreted that e-mail as a reference to "potential pre-pardons, I believe." People's Exhibit 207, Tr. 3603, Defendant's Motion at pg. 13. Mr. Cohen testified further on cross-examination that "I spoke to my attorney about it because we had seen on television President Trump talking about, potentially, pre-pardoning everybody and putting an end to this, what I deemed to be a nightmare," Tr. 3835-3836, Defendant's Motion at pg. 13.

Cohen 3a-b: Defendant argues that the following exhibits and testimony were introduced through Mr. Cohen in violation of the Presidential immunity doctrine:

- Cohen 3a: A February 6, 2018, text from Mr. Cohen to a NYT reporter that Defendant "just approved me responding to [the FEC] complaint and statement. Please start writing and I will call you soon;"[21] Mr. Cohen's February 13, 2018, public response to the FEC complaint in which Mr. Cohen stated that he used his own funds to pay Ms. Daniels and that "[n]either the Trump Organization nor the Trump campaign was a party to the transaction with

---

[20] As discussed in greater detail below, in April 2018, following the execution of search warrants on his office and home, Mr. Cohen sought legal representation. Robert Costello was one of the attorneys he initially consulted. Mr. Costello represented to Mr. Cohen that he had a close relationship with Rudy Giuliani, a lawyer with close ties to Defendant. Mr. Costello represented that these relationships would be beneficial to Mr. Cohen because they would provide a back channel for communicating with Defendant to ensure that Mr. Cohen would be protected. Tr. 3593-3595.

[21] People's Exhibit 260, Defendant's Motion at pg. 13.

[Daniels];"[22] a February 19, 2018, text from Jay Sekulow, private counsel to Defendant, to Mr. Cohen that Mr. Sekulow's "[c]lient says thanks for what you do;"[23] Mr. Cohen's trial testimony that he interpreted the text message to mean Defendant appreciated "the statement that [Cohen] was putting out to the press on the FEC;"[24] and testimony from Mr. Cohen that he "was instructed…by Mr. Trump, to keep in touch with Jay Sekulow because he [Sekulow] was in contact with Mr. Trump."[25]

- Cohen 3b: Mr. Cohen's testimony that he told Mr. Pecker, "the [FEC] matter is going to be taken care of and the person, of course, who is going to be able to do it is Jeff Sessions," and that Defendant "told" Mr. Cohen that Attorney General Sessions would address the matter.[26]

Cohen 4: E-mail communications with Robert Costello on April 21, 2018, relating to Defendant's posts on Twitter earlier that day. People's Exhibit 205, Defendant's Motion at pgs. 14-15. The subject line of the e-mail read "Giuliani" and the heading read "Attorney Client Communication Privileged." Defendant specifically references the last line of the e-mail wherein Mr. Costello wrote, "P.S. Some very positive comments about you from the White House." Mr. Cohen testified that the e-mail from Mr. Costello "let me know that I was still important to the team and stay the course, that the President had my back." Defendant alleges that the communications in the e-mail were from Defendant and thus, constitute official acts. Tr. 3598-3600.

None of the above-referenced communications constitute official acts.

With respect to Cohen 1, the Court finds that this testimony did not in any way introduce evidence of an official act by Defendant. Mr. Cohen testified at trial about testimony he gave under oath to Congress relating to an ongoing investigation, the subject matter of which were allegations of Russian interference in the 2016 election and a Trump Moscow real estate project. Tr. 3550. As Mr. Cohen had admittedly testified untruthfully before Congress, and the false prior testimony was used to attack his credibility, the People were permitted to attempt to rehabilitate him by explaining why he testified untruthfully. The reference to "no Russia Russia Russia" did not reference official conduct of Defendant, but merely Mr. Cohen's explanation that he had perjuriously minimized the frequency and duration of his contacts with Defendant about the Trump real estate project to curry favor with Defendant at a time when Mr. Cohen felt he needed Defendant's support. The trial

---

[22] People's Exhibit 202, Defendant's Motion at pg. 13.

[23] People's Exhibit 217, Defendant's Motion at pg. 13.

[24] Tr. 3573, Defendant's Motion at pg. 14.

[25] Tr. 3571, Defendant's Motion at pgs. 13-14.

[26] Tr. 3577, Defendant's Motion at pg. 14.

evidence was clear, Mr. Cohen lied under oath to a federal body. The challenged testimony was relevant for the jury to hear that Mr. Cohen's motivation for lying to Congress was to remain consistent with the Defendant with whom he had been in lock-step for decades. Significantly, the subject of Cohen 1 relates to matters that occurred prior to Defendant becoming President and do not involve communications with the President.

Cohen 2 and Cohen 4 relate to communications between Mr. Cohen and Mr. Costello. Mr. Cohen testified that when he became the subject of certain investigations, he sought legal representation and Mr. Costello was one of the attorneys he consulted during his search. Mr. Cohen testified that it was of paramount importance that he retain an attorney who would represent his interests. The communications with Mr. Costello paint the picture of an attorney who was attempting to convince Mr. Cohen that his connections to the President made him the best choice for the job of legal counsel to Mr. Cohen. Mr. Cohen ultimately was not convinced. The communications in Cohen 2 and 4 reflect Mr. Costello's approach. Mr. Cohen's testimony that he believed Mr. Costello was referring to potential "pre-pardons" did not purport to be a communication from Defendant and thus, did not implicate any Presidential immunity doctrine. In fact, the record demonstrates that Defendant agrees.

On April 15, 2024, the prosecution and the defense argued at length about certain communications. The parties differed with regard to whether the communications were probative of the pressure campaign. Defendant argued for preclusion of the testimony to prevent witnesses, such as Mr. Cohen, from inculpating the Defendant. Defendant's position at that time, was "there is zero evidence that anything that Mr. Costello said to Mr. Cohen came from President Trump." Tr. 52. Counsel further argued "there is no connection between the communication from Mr. Costello to Mr. Cohen and anything President Trump said or did […]." Tr. 52. The substantive testimony from Mr. Cohen regarding "pardons" which Defendant now argues violated Presidential immunity, was in fact elicited not by the People, but by defense counsel on cross-examination. In fact, defense counsel explored the subject of presidential pardons at length to attack Mr. Cohen's credibility. Defendant's arguments on this point in the instant motion are wholly inconsistent with the position he took at trial:

> Defense Counsel: So, I want to talk now about your testimony to Congress about whether you ever requested a pardon, okay?
> Mr. Cohen: Yes, sir.
> Defense Counsel: On that February 27, 2019, House Committee Hearing you gave a statement under oath that you never asked for, nor would you ever accept a pardon from President Trump, correct?

30

Mr. Cohen: Correct.

Defense Counsel: And that was false, correct?

Mr. Cohen: No sir.

Defense Counsel: Why was that not false?

Mr. Cohen: I never asked for it. I spoke to my attorney about it because we had seen on television President Trump talking about, potentially, pre-pardoning everybody and putting an end to this, what I deemed to be a nightmare. So I reached out to my attorney to ask him whether or not this is legitimate.

Defense Counsel: So, when you were asked – when you provided testimony – and, again, same thing happened on that occasion, you had to prepare remarks that you provided the committee and then you read into the record, right?

Mr. Cohen: Yes, sir.

Defense Counsel: And both of those prepared remarks in writing and also when you said, and I have never asked for, nor would I accept a pardon from President Trump, correct?

Mr. Cohen: Correct.

Defense Counsel: Now, that was on February 27th. Do you remember about ten days later you were deposed in the House Oversight Committee?

Mr. Cohen: Yes, sir.

Defense Counsel: And do you remember being asked the same question about accepting a pardon and you saying that you directed your lawyer to explore the possibility because you were a hundred percent open to accepting it?

Mr. Cohen: Yes, sir.

Defense Counsel: And the lawyer – there were a couple of lawyers that you were talking about, right? One was Mr. Ryan, who worked – who was your lawyer who worked with a law firm called McDermott, Will and Emery?

Mr. Cohen: Yes.

Defense Counsel: And you spoke with a lawyer named Robert Costello about that same issue, about exploring the possibility of a pardon, correct?

Mr. Cohen: I spoke to Mr. Costello about that as well.

Defense Counsel: And in that deposition so, not the sworn testimony on February 27th, but in that deposition, you said that, you directed your lawyers to explore the possibility of a pardon because the possibility was constantly being dangled in your face, right?

Mr. Cohen: Correct.

Defense counsel's cross-examination of Mr. Cohen on the subject of Presidential pardons continued for some time. Tr. 3838-3843. For counsel to ignore his extensive cross-examination on this subject, following what was a passing reference to "pre-pardons" generally on direct examination, mischaracterizes the actual record.

Cohen 3a and 3b relate to communications about investigations by the FEC into conduct by Mr. Cohen and Defendant during the 2016 Presidential campaign. The communications relate to Defendant as candidate for President, not to Defendant as President and reference no official act. Notably, all the participants in these conversations were decidedly related to Defendant in his personal capacity, Mr. Cohen and Mr. Sekulow as prior and then private counsel, and Mr. Pecker, a

31

personal friend. Similarly, Mr. Cohen's attempt to funnel a journalist a story relating to the payments he made to Ms. Daniels, was intended to shine a more favorable light on Mr. Cohen and Defendant - his co-conspirator. That e-mail had nothing to do with official acts by Defendant as President and everything to do with him as candidate.

This Court agrees and is persuaded that the testimony referenced in Cohen 3a and 3b does not implicate Defendant's conclusive and preclusive authority. The People argue, "[a]s relevant here, the FEC has "exclusive jurisdiction with respect to the civil enforcement" of FECA, 52 U.SC. § 30106(b)(1), which is not "subject to control of the Attorney General," *Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 92 n.1 (1994) (citing 28 U.S.C. §§ 516, 519)." People's Response at pg. 30. Further, "[b]ecause neither the President nor the Attorney General has authority to interfere with an FEC investigation, this situation is distinct from one in which the President [...] directs the Attorney General to initiate a prosecution or investigation [...]." People's Response at p. 31, n 6.

As previously noted, the objections to Mr. Cohen's testimony were unpreserved and thus unreviewable. Nonetheless, as an alternative holding, this Court finds that the argument also fails on the merits because his testimony reflected unofficial conduct and no level of immunity applies. Even if the testimony did pertain to conduct falling within the outer perimeter of his Presidential authority subject to presumptive immunity, this Court finds that the People have once again rebutted that presumption without invoking the motive for the conduct.

### Defendant's Twitter Posts

Turning to Defendant's claim that certain Tweets he caused to be posted constitute official acts, in dispute are People's 407F, 407G, 407H, and 407I. The Tweets cover a range of topics, including but not limited to: disparaging remarks about a New York Times reporter; explaining what a NDA is; and presumably, advice whether one should retain Mr. Cohen as an attorney.

As previously stated, this Court finds that Defendant has properly preserved his arguments as to this evidence. However, after applying the standards set forth in *Trump*, this Court finds that none of the four posts constitute official acts.

Defendant argues that the social media posts reflect the President's extraordinary power to speak to his fellow citizens and that viewing the context of the Tweets further supports that position. Defendant's Motion at pg. 33. The Twitter account, Defendant contends, was one of the White House's main vehicles for conducting official business. *Id.* In support of this position, Defendant argues that "the official-acts conclusion is further supported by the fact that President Trump relied

32

on a White House employee to help him operate the account." Defendant's Motion at pg. 34. Defendant further argues that the prosecution "relied on false opinions from Cohen and Daniels to try to suggest that these Tweets were directed at them, individually, rather than what they objectively were: communications with the American people regarding matters of public concern bearing on President Trump's credibility as the Commander in Chief." *Id.* Defendant claims that 407I simply reflects Defendant's comments on, and criticism of, federal prosecutors and regulators and that, pursuant to *Trump,* such posts are covered by the Presidential immunity umbrella because "investigative and prosecutorial decision making is 'the special province of the Executive Branch,' and the Constitution vests the entirety of the executive power in the President." Defendant's Motion at pg. 36.

The People contend that the Tweets "consist solely of 'unofficial acts' for which 'there is no immunity.'" People's Response at pg. 13 citing *Trump* at 651. They further argue that the "challenged Tweets bear no resemblance to the kinds of public comments that the Supreme Court indicated would qualify as official presidential conduct." *Id.* at 15. The People also argue that, even if the Tweets are deemed "official conduct," the presumptive immunity that attaches is easily rebutted, as there is no danger that introducing the posts into evidence, presents any "intrusion on the authority and functions of the executive branch." *Id.* at 16.[27]

"The justifying purpose of the immunity recognized in *Fitzgerald* and the one we recognize today are not that the President must be immune because he is President…they are to ensure that the President can undertake his constitutional functions free from undue pressure or distortions." *Trump* at 615. The Tweets do not constitute the type of conduct the *Trump* Court intended to protect when it discussed a President's ability to communicate with the public. To find otherwise would effectively mean that every statement ever uttered (or posted on social media) by a sitting President, whether personal or official, in his or her own interests or that of the Country, would be protected by absolute immunity. Were that the case, the *Trump* Court would not have felt it necessary to provide guidance to assist the Federal District Court in properly analyzing and determining which Presidential acts are official and which are not. For example, when discussing Defendant's alleged attempts to undermine the January 6 certification proceeding, the *Trump* Court noted that there may

---

[27] The People also argue that this evidence "consists of a public record of an official act" and is thus admissible even if it is deemed official acts. People's Response pg. 13. This Court is not persuaded that this is an accurate reading of *Trump* as to evidence of a public record and thus, declines to apply this reasoning to the Tweets at issue.

33

be "contexts in which the President, notwithstanding the prominence of his position, speaks in an unofficial capacity – perhaps as a candidate for office or party leader." *Trump* at 629. This point was further emphasized by Chief Justice Roberts when he unequivocally wrote that "not everything the President does is official." *Id.* at 642. The analysis and guidance are pragmatic.

Undoubtedly, there are Tweets and other communications that a President makes that qualify as official communications with the public regarding matters of public concern. In the modern world, social media is but one of many forms of communication that a President can employ to convey messages of the utmost import, such as to comfort a hurting nation after a tragedy. The Tweets in question, however, do not fit that mold. As such, none of the disputed Tweets, whether preserved or not, constitute official acts subject to absolute immunity, nor do they fall within the outer perimeter so as to raise a presumption of immunity.

When the *Trump* Court discussed Defendant's Tweets, and in particular his speech on January 6, 2021, the Court reasoned that a President possesses an "extraordinary power to speak to his fellow citizens and on their behalf." *Trump* at 629. The *Trump* Court illustrated that this extraordinary power, could be exercised to advance the public interest, such as when the nation needs to be comforted in the wake of a national tragedy. *Id.* People's 407F reflects Defendant's comments about "The New York Times and a third rate reporter named Maggie Haberman, known as a Crooked H Flunkie […]going out of their way to destroy Michael Cohen and his relationship with me in the hope that he will 'flip.' […] Sorry, I don't see Michael doing that […]." Viewing People's 407F in the context of *Trump*, it leaves little doubt that such a communication does not approach the illustrations provided by the *Trump* Court. People's 407F does not advance a policy concern or other public interest. As such, it is not an official act and it is not protected by any level of immunity. Even if this Court were to find that it falls within the outer perimeter subject to presumptive immunity, it would find that the People have rebutted that immunity without relying on the motive behind the conduct.

This Court finds that People's 407G is also entirely personal in nature. The subject is a personal retainer with an attorney about a personal matter and an NDA. The post asserts that it was a "private agreement" between two individuals, entered into before Defendant took Office. This is precisely the type of personal speech the *Trump* Court contemplated when it held that "although Presidential immunity is required for official actions to ensure that the President's decision making is not distorted by the threat of future litigation stemming from those actions, that concern does not

34

support immunity for unofficial conduct." *Trump* at 615. This Court finds Defendant's argument that the *Trump* Court intended to protect this type of speech unavailing.

This Court also finds that the Tweet in People's 407H does not constitute an official act nor is it the type of communication the *Trump* Court contemplated when it referenced President Theodore Roosevelt's famous "bully pulpit" as a means to "persuade Americans, in ways that the President believes would advance the public interest." *Id.* at 629 ("Indeed, a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest."). People's 407H, in this Court's view, merely contains Defendant's thoughts on the services of his former private attorney.

Regarding the final Tweet, People's 407I, Defendant argues that this Tweet is afforded the protections of Presidential immunity as it is part of the "core authority of the Nation's Chief Executive" to "comment upon and criticize the conduct of federal prosecutors and regulators" which he derives from Article II authority. Defendant's Motion at pgs. 35, 36. This is because the content of this Tweet, and its context, referred to Mr. Cohen, his former personal attorney, as a person willing to "make up stories" and "break," as opposed to Paul Manafort, Defendant's campaign chairman, who was not. Just as the title of Communications Director does not bestow absolute immunity to any and all communications with Ms. Hicks, neither does mere reference to the Justice Department convert a Tweet to an official act. This Court is not convinced by Defendant's argument. While the *Trump* Court has made clear that the President must be protected, and therefore receive absolute immunity, when conducting official business such as when directing the Office of the Attorney General, the Defendant's Tweet in People's 407I contains nothing of the sort. Nor is this Court persuaded, for the reasons stated in the preceding paragraphs, that this Tweet made in Defendant's personal capacity, constitutes an official act. This Twitter post and the communication contained therein does not constitute a core official act nor does it fall within the outer perimeter of his official duties.

## PART VI: HARMLESS ERROR

The People argue that if this Court concludes that "any evidence of official presidential acts [were] improperly admitted at trial," Defendant's request to "set aside the verdict should be rejected on harmless-error grounds." People's Response at pg. 38. In response, Defendant argues that harmless error does not apply here because "federal constitutional reasoning forecloses harmless-

35

error analysis under New York law in a manner similar to the treatment of 'structural errors' and 'mode of proceedings errors.'" Defendant's Motion at pg. 44.

Even if this Court did find that the disputed evidence constitutes official acts under the auspices of the *Trump* decision, which it does not, Defendant's motion is still denied as introduction of the disputed evidence constitutes harmless error and no mode of proceedings error has taken place.

The Court of Appeals has held that "'[t]he paramount purpose of all rules of evidence is to ensure that the jury will hear all pertinent, reliable and probative evidence which bears on the disputed issues.'" *People v. Robinson*, 17 NY3d 868 [2011] *citing to People v. Miller*, 39 NY2d 543, 551 [1976]. If the error at issue violates a defendant's constitutional rights, the constitutional test for harmless error applies. *People v. Goldstein*, 6 NY3d 119 [2005]. That is, the burden is on the People to show that any error was harmless beyond a reasonable doubt. *Id.* citing *Chapman v. California*, 386 US 18, 24 [1967] and *People v. Crimmins*, 36 NY2d 230 [1975]. Non-constitutional harmless errors do not involve constitutional provisions. As such, there is a less exacting standard of review. In such instances, the error is deemed harmless if there is overwhelming evidence of a defendant's guilt and there is no significant probability that the error affected the outcome of the trial. *People v. Mairena*, 34 NY3d 473 [2019]; *People v. Vargas*, 154 AD3d 971 [2d Dept 2017]. "Our State test with respect to non-constitutional error is not so exacting as the Supreme Court test for constitutional error." *Crimmins*, 36 NY2d at 241. "We observe that in either instance, of course, unless the proof of the defendant's guilt, without reference to the error, is overwhelming, there is no occasion for consideration of any doctrine of harmless error." *Id.* Whether "overwhelming proof of guilt" exists cannot be determined with mathematical precision. *Id.* The vast majority of New York courts, including the court in *Crimmins*, consider two discrete factors when determining whether an error was harmless: (1) the quantum and nature of the evidence against the defendant if the error is excised and (2) the causal effect the error may nevertheless have had on the jury. *People v. Clyde*, 18 NY3d 145 [2011] *citing to People v. Hamlin*, 71 NY2d 750 [1988].

As discussed in Part V(a) supra, mode of proceedings errors occupy a very narrow set of claims and "go to the essential validity of the process and are so fundamental that the entire trial is irreparably tainted." *Kelly* 5 NY3d 116, 119-120, *People v. Cabrera*, 41 N.Y.3d 35 [2023]. These types of errors are not easily defined. *People v. Mack*, 27 NY3d 534 [2016]. Since such errors require "reversal without regard to the prejudice, or lack thereof, to the defendant, the Court of Appeals has

been hesitant to expand this doctrine. *Id.* at 540. "The designation of a mode of proceedings error is therefore 'reserved for the most fundamental flaws." *Id.* at 541.

Defendant's primary argument on this point is that "Presidential Immunity errors were not and are never 'harmless.'" Defendant's Reply at pg. 18. This argument is premised on the claim that errors involving Presidential immunity constitute mode of proceedings errors. Defendant argues that the official acts evidence at the heart of his motion fall under the rubric of Presidential immunity and are therefore "structural errors" of the "type of danger that would lead Presidents to be chilled from taking the bold and unhesitating action required of an independent Executive." *Id.* at pgs. 19-20. Defendant points to the Supreme Court's warning that "official acts evidence raises a unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Id.*

The People dispute the "importance or constitutional nature of official acts immunity" and submit that the conduct alleged here is not unique. People's Response at pg. 36. They further argue that many "evidentiary privileges derive from important public policy concerns...[y]et the Court of Appeals has applied harmless error analysis even to extremely important evidentiary privileges."[28] *Id.* Finally, the People argue that even if the disputed evidence was introduced in error at trial, the remaining evidence supports a finding of guilt.[29] People's Response at pg. 39.

As an initial matter, this Court does not agree that the alleged error here qualifies as a mode of proceedings error such that it is not subject to harmless error analysis. Mode of proceedings errors typically involve situations that strike at the heart of a trial, such as a court failing to advise counsel "with meaningful notice of [a] substantive jury note." *People v. Morrison*, 32 NY3d 951 [2018]. In addition to the examples provided in Part V(A) *supra*, other examples of the high procedural bar can include a trial judge's inappropriate commentary before a jury regarding a defendant's decision not to testify (*People v.* McLucas, 15 NY2d 167 [1965]) and the conviction for a crime that does not exist within the Penal Law (*People v.* Martinez, 81 NY2d 810 [1993]. In each of those instances, the Court of Appeals found that the errors were so fundamental to "the organization of the court or the mode

---

[28] In a footnote, the People cite examples such as *People v. Rivera*, 25 NY3d 256 [2015] where harmless error analysis was applied to the physician-patient privilege and *People v. Carmona*, 82 NY3d 603 [1993] where it was applied to the cleric-congregant privilege. People's Response at pg. 36 n8.

[29] As the People tacitly acknowledge in Footnote 9 of their Response, the trial record in this matter is dense. Nonetheless, this Court will be succinct when referencing the selected testimony and exhibits in this portion of its Decision.

of proceedings proscribed by law," that the failure to preserve their objection was of no import. *Patterson*, 39 N.Y.2d at 295.

This Court finds that even if the disputed evidence was admitted in error, such error was harmless. "Not every error committed in the course of a criminal prosecution will necessarily lead to a reversal or modification of a judgment of conviction, and that, subject to certain exceptions, an error will be disregarded if it is determined to have been harmless." The Powers of the New York Court of Appeals, NYCTAPP §21:13, *Crimmins* 36 NY2d at 239. "Even when constitutional errors, as other errors, have occurred in a case, they do not require reversal when a reviewing court can conclude with confidence that they were harmless beyond a reasonable doubt." *Smith*, 97 NY2d at 330.

In addition to presiding over every stage of these proceedings, this Court has carefully scrutinized the trial record, including all evidence such as: invoices, general ledger entries, recorded phone conversations, text messages, e-mails, Mr. Weisselberg's handwritten notes, and video footage. This also includes testimony from Mr. Cohen[30], Ms. Daniels, Mr. McConney, Keith Davidson, Mr. Pecker, and Gary Farro to name but a fraction of the evidence the jury heard and considered, separate and apart from that evidence and select testimony which Defendant challenges on Presidential immunity grounds. Also included was evidence in the form of Defendant's own words from his many published books. This Court concludes that if error occurred regarding the introduction of the challenged evidence, which it does not, and such error were excised, such error was harmless in light of the overwhelming evidence of guilt. *Crimmins* at 230.

## PART VII: USE OF OFFICIAL ACTS IN GRAND JURY

Defendant argues that the use of alleged official acts evidence in the grand jury tainted the proceedings and requires dismissal of the indictment. Defendant's Motion at pg. 41. The official acts referenced by Defendant essentially mirror the trial evidence he has challenged. See Part V above. The only evidence presented in the grand jury, that was not introduced at trial, is the testimony of the witness identified as Trump Counselor.[31]

---

[30] This Court, having had the unique opportunity to hear Mr. Cohen's testimony and to observe his demeanor on direct and cross examination and to form an opinion as to his credibility, does in fact credit his testimony.
[31] As this witness testified in the grand jury and not at trial, they will be referred to as Trump Counselor throughout this Decision.

The People's response in opposition is similar to their arguments discussed *supra*. Specifically, that Defendant did not preserve this claim and even if he had, the argument would fail on the merits. They further argue that any error committed in the grand jury is harmless. People's Response at pgs. 61-63. In response to the People's preservation argument, Defendant once again argues that the *Trump* Court addressed an issue of first impression and therefore, *Trump* "constitutes 'good cause' for the timing of the motion." Defendant's Reply at pg. 2.

In Part V, this Court analyzed the respective arguments of the parties as they apply to the evidence introduced at trial. Here, this Court analyzes the arguments in the context of the grand jury presentation and sees no reason to depart from the conclusion reached *supra*. In Part V(A), this Court ruled that where Defendant failed to make a timely and proper objection to the introduction of evidence at trial, he has failed to adequately preserve his objections to such evidence for purposes of CPL § 330.30(1) review. The same is true in the context of grand jury testimony.

Here, Defendant never lodged an objection to the sufficiency of the grand jury proceedings or the propriety of Trump Counselor's testimony on the grounds of Presidential immunity. Notably, Defendant, in his Reply to the People's Opposition, does not, and it seems cannot, point to any instance where such an objection was made. In Defendant's Reply, he again references "good cause" for the timing of his motion and his failure to preserve his arguments. Defendant's Reply at pg. 2. As this Court reasoned when addressing preservation in Part V(A) *supra*, "good cause" and "interest of justice" are not legally viable standards for a CPL § 330.30(1) review in the absence of preservation. *Carter*, 63 NY2d 530.

In the alternative, were this Court to find that Defendant did properly preserve his objections as to the purported official acts evidence presented to the grand jury, Defendant's claim is nonetheless denied on the merits. It is not necessary for this Court to repeat its detailed analysis in Section V *supra*. The testimony of Trump Counselor did not pertain to official acts as contemplated by *Trump*. Instead, this Court will only address Defendant's arguments with respect to Trump Counselor as well as Mr. Pecker's testimony relating to Attorney General Jeff Sessions.[32]

Trump Counselor testified regarding their role and duties during Defendant's time as President. They further testified that they had "formal and informal" meetings with Defendant. Regarding the instant matter, they testified to having general discussions about Ms. Daniels when news about the payments resurfaced in 2018. This testimony ranged from media appearances the

---

[32] The Court's analysis of the testimony of Mr. Pecker is made in light of the *Trump* Court's ruling that a President has the absolute discretion to "decide which crimes to investigate and prosecute." *Trump* at 621.

witness made, to comments about the news, discussing NDAs with Defendant, to discussing the various media appearances made by Ms. Daniels' attorney at the time, Michael Avenatti. As analyzed above, the discussions between Defendant and Trump Counselor are nothing more than conversations about personal matters. Notably, this witness testified in the grand jury, that their conversations with Defendant about Ms. Daniels, were not related to official conduct and dealt more with Defendant's then private attorney. Indeed, Trump Counselor questioned why they would be asked questions about Defendant's payments to Ms. Daniels when they had nothing to do with the White House or the campaign.

With respect to Mr. Pecker, he testified in the grand jury, in sum and substance, what Mr. Cohen told him: that the United States Attorney General reports to the President. A fact that is public knowledge and involves no official acts such as the Executive Branch deciding which crimes to investigate and prosecute.

Finally, this Court cannot agree with Defendant's interpretation of *People v. Ohrenstein*, 153 AD2d 342 [1st Dept 1989] that an "indictment cannot be legally sufficient if it is based on grand jury testimony which may require inquiry into legislative acts or the motivation for legislative acts." Defendant's Motion at pg. 42. Specifically, Defendant argues that the trial court in *Ohrenstein* "dismissed additional charges based on the finding that two of the remaining defendants were 'prejudiced by the erroneous theory' presented to the grand jury." *Id.* Defendant's reading of *Ohrenstein* presumes that because *Trump* held that a former President cannot be indicted for conduct for which they are immune from prosecution, then the indictment here must be dismissed. This argument is premised on a finding that the evidence in dispute, i.e. that which was presented to the grand jury, constitutes official acts for which Defendant is entitled to immunity. This Court has not made such a finding. As such, Defendant's motion in this respect is denied.

### PART VIII: CONCLUSION

This Court finds that Defendant preserved his claims only as to the testimony of Hope Hicks, OGE Form 278e, and Twitter postings identified as People's Exhibits 407F through 407I. All other claims are denied as unpreserved; and

This Court further finds that the evidence related to the preserved claims relate entirely to unofficial conduct and thus, receive no immunity protections; and

40

As to the claims that were unpreserved, this Court finds in the alternative, that when considered on the merits, they too are denied because they relate entirely to unofficial conduct entitled to no immunity protections; and

Further, even if this Court were to deem all of the contested evidence, both preserved and unpreserved, as official conduct falling within the outer perimeter of Defendant's Presidential authority, it would still find that the People's use of these acts as evidence of the decidedly personal acts of falsifying business records poses no danger of intrusion on the authority and function of the Executive Branch, a conclusion amply supported by non-motive-related evidence; and

Lastly, this Court concludes that if error occurred regarding the introduction of the challenged evidence, such error was harmless in light of the overwhelming evidence of guilt.

Defendant's motion to dismiss the indictment and vacate the jury verdict pursuant to CPL § 330.30(1) is denied.

The foregoing constitutes the Decision and Order of the Court.

Dated: December 16, 2024
New York, New York

Juan M. Merchan
Judge of the Court Claims
Acting Justice of the Supreme Court

HON. J. MERCHAN

41